Morris NEWMARK and Julia Newmark,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

No. 116, Docket 27578.

United States Court of Appeals
Second Circuit.

Argued Nov. 26, 1962.

Decided Dec. 27, 1962.

914

Morris Newmark (Harry L. Jessop, New York City, of counsel), pro se, for petitioners-appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson, David O. Walter, and Alan D. Pekelner, Attys., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before CLARK, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

After a determination of a deficiency in his federal income tax for the years 1946 and 1947, Morris Newmark petitioned the Tax Court for a redetermination. The Tax Court held that demand notes of $13,000 and $13,400, issued by the Eastern Cutter Corporation in 1946 and 1947 respectively, represented additional income to Newmark and was taxable as such, either on a theory of constructive receipt or on the theory that the notes were applied against a loan previously extended to Newmark by the corporation. Newmark appeals from the adverse decision and from the denial of his motions for a new trial and for a reconsideration, vacation, and revision of the Tax Court's disposition. We affirm the decision below.

The case was tried upon stipulated facts. The stipulation incorporated by reference various affidavits, letters and portions of transcripts from earlier judicial proceedings. These documents, when read together, provide ample support for the conclusions of the Tax Court. Stripped to essentials, the facts are these. On September 21, 1945 the taxpayer and a Mr. Barber entered into an agreement with Ansel R. Abeel, Sr., in which the taxpayer and Barber were to purchase, for $50,000, all the shares of the Eastern Cutter Corporation on or before October 1, 1945. In order to finance the purchase, Newmark and Barber applied for a $50,000 loan to Intermediate Factors Company, which, on October 1, granted the loan and exacted a charge of $4,000 for the use of its money. A rapid series of further occurrences on October 1, 1945, resulted in a consummation of the loan and a purchase of the shares in Eastern Cutter. Newmark and Barber, in return for the loan from Intermediate Factors, executed a demand note for $54,000. With the proceeds of their loan, the two men purchased the shares in the corporation, and immediately installed themselves as officers of the corporation (Newmark as president, and Barber as secretary and treasurer) and, along with their wives, as the board of directors. In order that the loan from Intermediate Factors be satisfied, the newly formed Eastern Cutter board of directors authorized a loan by the corporation to Newmark and Barber of $27,625 each, and during the following week, the two men borrowed and withdrew a total of $54,000 from Eastern Cutter's bank account. By October 9, 1945, Newmark and Barber had completed payment of the $54,000 demand note held by Intermediate Factors.

On October 1, 1945, an employment contract was executed in which Newmark was hired for a term of five years as president and director at a salary of $300 per week. Barber executed an identical contract as secretary, treasurer, and director. Newmark's (and Barber's) yearly salary was thus $15,600. On his 1946 federal income tax return, however, Newmark reported as salary only $2,600 and in 1947, only $2,200. He did not report the balances of $13,000 and $13,400 which were alleged in the notice of deficiency to have been constructively received. The Government contends, and the Tax Court found, that salary credits to the full extent of the taxpayer's salary were issued in the form of monthly demand notes throughout 1946 and 1947,

and that, although the taxpayer may have received only $2,600 and $2,200 in cash from Eastern Cutter, the balance of the salary credits was applied in satisfaction of Newmark's debt of $27,625 to the corporation, or could have been converted into cash at the will of the taxpayer. On either theory—discharge of indebtedness or constructive receipt—it is contended that there was income to Newmark of $15,600 in each of the two years in question.

 We need devote little time to reciting the applicable rules of law, for they are basic and uncontested. The doctrine of constructive receipt has been explained as follows:

"A taxpayer should not have the right to select the year in which to reduce income to possession. It is now well setted that income which is subject to a taxpayer's unfettered command and which he is free to enjoy at his own option is taxed to him as his income whether he sees fit to enjoy it or not. The doctrine of constructive receipt is to be applied where a cash basis taxpayer [as is Newmark in the case before us] is presently entitled to money, which money is made immediately available to him, and his failure to receive it in cash is due entirely to his own volition." 2 Mertens, Federal Income Taxation § 10.01 (1961).

See Weil v. Commissioner, 173 F.2d 805 (2d Cir., 1949); Hedrick v. Commissioner, 154 F.2d 90 (2d Cir.), cert. denied, 329 U.S. 719, 67 S.Ct. 53, 91 L.Ed. 623 (1946). Of course, since the payments in question must be available on demand, a showing that Eastern Cutter was insolvent or that funds to meet the salary credits were otherwise unavailable will avoid an application of the doctrine of constructive receipt. See Parris, 20 B.T.A. 320 (1930). But this is a question of fact, Weil v. Commissioner, supra, and the burden of proof is upon the taxpayer to show that amounts credited to him were not unqualifiedly subject to his demand, cf. Aramo-Stiftung v. Commis-

sioner, 172 F.2d 896 (2d Cir., 1949), Weiss, 7 B.T.A. 615 (1927).

 The rules of law regarding cancellation of indebtedness are equally clear. "When a taxpayer's obligations are assumed by another or are reduced or canceled as part of a business transaction, and the taxpayer is thereby enriched, taxable income may result." Mertens, supra, § 11.19. In the employment situation we have before us, payment of salary to the employee as compensation for services followed by repayment to the corporation in order to satisfy a debt may be short-circuited by the accounting device of crediting the salary against the debt, without any cash changing hands. By either device, the taxpayer receives income. See Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929). Again, the burden of proof is upon the taxpayer to show that a discharge of a debt did not result in taxable income to him. See Mertens, supra, § 11.19. Newmark's continued assertions that the Commissioner had failed to prove constructive receipt and discharge of indebtedness are therefore somewhat misguided. The Tax Court concluded, in effect, that Newmark had failed to prove otherwise, and we can upset these conclusions of the Tax Court only if we find them to be clearly erroneous.

The crucial factual elements are the nature of the salary credits and demand notes issued by the corporation, the understanding between the corporation and the taxpayer as to the application of these credits against taxpayer's debt of over $27,000, and the financial ability of the corporation to make good on those credits were the taxpayer to have demanded payment.

 It is clear from the documentary evidence before us that Eastern Cutter did in fact credit the accounts of both the taxpayer and Barber with weekly salary credits from January 1, 1946 through December 31, 1947, and that demand notes were issued accordingly. Although Newmark, a certified public

accountant with responsibility for keeping the corporation's books, did not keep them current during the years in question, the following information was elicited from him during a proceeding in bankruptcy of the Eastern Cutter Corporation conducted in 1948, the minutes of which were before the Tax Court.

"The Referee: Is there any entry in any book of the company indicating that you received those notes?

"The Witness [Newmark]: No books of account as yet.

\* \* \* \* \* \*

"The Referee: Where is a record showing that they were given to you and Mr. Barber by the company \* \* \*?

"The Witness: In the minutes.

\* \* \* \* \* \*

"Q. Now, when was it that the company by resolution was authorized to issue notes to you and Mr. Barber for unpaid salary? A. I believe it was early in 1946.

"Q. Well, were the notes issued early in 1946? A. Yes.

\* \* \* \* \* \*

"Q. In other words, every month thereafter you issued to Barber and yourself notes of the company for unpaid salary? A. That's right."

There is also little doubt that the corporation (in effect, Newmark and Barber) considered the taxpayer to have been recompensed in the sum of $15,600 in each year, for Eastern Cutter filed corporate federal income tax returns for the calendar year 1946 and 1947 claiming that amount as a deduction for compensation of its officers, Newmark and Barber. It was in fact Newmark who assisted in the preparation of both of these returns and who signed them. Similarly, when the corporation's books were finally brought up to date during the bankruptcy proceedings in 1948, officers' salaries were accrued to the extent of $13,400 for 1946 and $13,000 for 1947.

The Tax Court's factual conclusion of constructive receipt is also well supported by the documentary evidence before that court and before us on appeal. The taxpayer clearly had the power to convert the corporate notes into cash at will. In the bankruptcy proceeding already referred to he also testified:

"The Witness: We drew money every week.

"The Referee: You drew cash money every week?

"The Witness: Yes.

"The Referee: For what?

"The Witness: For our own salaries to apply on account of the total amount of the contract; we drew whatever we felt we wanted to draw."

The petitioner, in his briefs, asserts that the corporation was without sufficient cash funds to meet payment on the demand notes, and there may be some support for this contention in the record. But the Tax Court was far from clearly incorrect in concluding that Eastern Cutter was solvent throughout the years 1946 and 1947. In Eastern Cutter's 1948 bankruptcy proceeding, Newmark testified that the corporation showed a profit during the period 1945–1947 if officers' salaries were not taken into consideration; if officers' salaries were considered, the best Newmark could assert 'was, "I don't know; I have not figured it out yet." This is certainly insufficient to sustain the petitioner's burden of proving that all or part of his salary payments were unavailable to him. Indeed, well after Newmark had "figured it out," he stated, along with Barber in an affidavit dated February 1951 and considered by the Tax Court as part of the agreed stipulation of facts:

"The operation of the Corporation's business continued successfully throughout the years 1946 and 1947. During this period, the Corporation duly met all its payrolls and overhead expenses, and its merchandise obligations were regularly paid in full by the tenth of each month. The Dun & Bradstreet rating of the Corporation improved to D+ 1½,

which indicates high credit and a pecuniary strength of $50,000 to $75,000.

\* \* \* \* \* \*

"It is thus clear that the Corporation was, from 1945 through 1947, at all times solvent and that it was able to, and did, meet its just debts as they matured \* \* \*."

The Tax Court was therefore justified in concluding that Newmark could readily have taken cash from the corporation or, with Eastern Cutter's apparently sound credit position, could have discounted the notes for cash.

Appellant asserts in his briefs that he had entered into an agreement with the corporation, purportedly because of its uncertain future, to withdraw only $50 per week rather than his rightful salary of $300. It is indeed true that "[I]ncome, although credited to the taxpayer, is not constructively received if its receipt is subject to substantial limitations or restrictions as to the time or manner of payment \* \* \*," and that "An understanding as to drawing against a credit, or modifying the terms of a contract, or contradicting a bookkeeping entry, may affect a constructive receipt." Mertens, supra, § 10.03. But the absence of any record evidence whatever of the purported agreement with the corporation makes it somewhat hazardous to assess the applicability here of this rule of law. The taxpayer had more than enough time, during the course of the rather protracted proceedings below, to call these facts to the attention of the Tax Court. The court's denial of the motion to revise and vacate its decision was not an abuse of its discretion.

In any event, the judgment of the Tax Court is supportable on the theory of discharge of indebtedness. As noted earlier, Newmark failed to keep Eastern Cutter's record books during 1946 and 1947. When the officers' "unpaid" salaries were accrued in 1948, the balance sheet was drawn so as to carry the loan to Newmark and Barber as an asset of $50,000 and their accrued salary as a lia-

bility of $52,800; the face of the balance sheet did not record any set-off. But surely this fact cannot be dispositive of the tax consequences between corporate employers and their employees, especially when the taxpaying employee happens to be an officer of the corporation in charge of drawing up its financial statements. In the Newmark-Barber affidavit last mentioned, this sworn statement was made:

"As the books of the Corporation disclose, the above-mentioned advances [the $54,000 loan to cover the purchase price of the stock] made to us by the Corporation were repaid in full, in the following manner: during the period of over two years commencing October 1, 1945, we devoted ourselves diligently to the affairs of the Corporation, under written employment agreements which fixed our salaries at $300 per week each \* \* \*. As a result of such payments and credits, the entire advance was repaid and liquidated, and our running accounts with the Corporation eventuated in a credit balance, in our favor, in excess of $10,000.00. No indebtedness on our part to the Corporation has since existed.

"\* \* \* the advance made to us by the Corporation in October, 1945 was fully repaid and satisfied by us."

Similar admissions recur with unhalting frequency in appellant's testimony before the referee in bankruptcy.

"Q. How much did you repay to the corporation out of this $54,000 that you used as you stated? A. I consider it is all paid back.

"Q. When you testified a few moments ago that some of it was paid back, what did you mean? A. Some in cash and some in credit."

The taxpayer is apparently riding two horses—one in the bankruptcy proceeding, where in order to avoid his obligation to Eastern Cutter, he urged that his loan from the corporation had been fully repaid out of its agreed salary debt to

him; the other in this tax proceeding, where he has found it tactically wiser to assert that his obligation to the corporation was not cancelled. This unusual equestrian feat is rarely, if ever, successfully performed before this Court. We find that the taxpayer has failed to do so here.[1]

The decision of the Tax Court is affirmed.

1. The taxpayer contends that the decision below should have been rendered in his favor at the outset, because the Commissioner's answer and motion to dismiss the taxpayer's petition were not timely filed under the Tax Court rules. But it has been decided that such untimeliness on the part of the Commissioner does not relieve the taxpayer of his obligation to make out a prima facie case. See Board of Tax Appeals v. United States ex rel. Shults Bread Co., 59 App.D.C. 161, 37 F.2d 442 (1929), cert. denied, 281 U.S. 731, 50 S.Ct. 246, 74 L.Ed. 1147 (1930). That case also held that the Tax Court rules could be modified "if the ends of justice seem to require it", and if there is no gross abuse of discretion in doing so. We therefore find appellant's contention to be without merit.